**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| **TOTAL QUALITY LOGISTICS, LLC** | : | **Case No. 1:16-cv-00335-MRB** |
| 4289 Ivypoint Blvd. | : | |
| Cincinnati, Ohio  45245 | : | **Judge Michael R. Barrett** |
| | : | |
| Plaintiffs | : | |
| | : | |
| | : | |
| vs. | : | **AMENDED COMPLAINT FOR** |
| | : | **INJUNCTIVE RELIEF AND DAMAGES** |
| **APTIVE SYSTEM, INC. d/b/a** | : | |
| **TRANSFIX, INC.** | : | |
| 394 Broadway, 2nd Floor | : | |
| New York, NY  10013 | : | |
| | : | |
| and | : | |
| | : | |
| **ANTHONY SPINOLA** | : | |
| 6223 Bordeaux Circle | : | |
| Sanford, FL  32771 | : | |
| | : | |
| **Also Serve At:** | : | |
| | : | |
| 394 Broadway, 2nd Floor | : | |
| New York, NY  10013 | : | |
| | : | |
| and | : | |
| | : | |
| **AARON JACOBS** | : | |
| 5451 Millenia Lakes Blvd. Apt 429 | : | |
| Orlando, FL 32839 | : | |
| | : | |
| and | : | |
| | : | |
| **MICHAEL GHEBREHIWET** | : | |
| 3201 Florene Drive | : | |
| Orlando, FL 32806 | : | |
| | : | |
| | : | |
| Defendants | : | |

Plaintiff, Total Quality Logistics, LLC ("TQL"), for its Complaint against the Defendants, Anthony Spinola ("Spinola") and Aptive System, Inc., d/b/a Transfix, Inc. ("Transfix"), Aaron Jacobs ("Jacobs") and Michael Ghebrehiwet ("Ghebrehiwet") (Spinola, Jacobs and Ghebrehiwet are also collectively referred to as "Former TQL Employees"), states, upon information and belief, as follows:

## NATURE OF THE ACTION

1.      The Defendant Spinola is a former employee of the Plaintiff TQL.  He is bound by TQL's "Employee Non-Compete, Confidentiality, and Non-Solicitation Agreement" (the "Agreement"), a true and accurate copy of which is attached as Exhibit A.  His employment from TQL terminated on June 10, 2015.

2.      The Defendant Jacobs is also a former employee of the Plaintiff TQL.  He is also bound by TQL's Agreement, a true and accurate copy of which is attached as Exhibit B.  His employment from TQL terminated on November 10, 2015.

3.      The Defendant Ghebrehiwet is also a former employee of the Plaintiff TQL.  He is also bound by TQL's Agreement, a true and accurate copy of which is attached as Exhibit C.  His employment from TQL terminated on December 30, 2015.

4.      This action results from the Former TQL Employees' violation of their Agreements and misappropriation of TQL trade secrets.  Upon information and belief, they are currently employed by Transfix, a TQL competitor.

5.      Furthermore, Transfix is aware of the Agreements but continues to employ the Former TQL Employees.

6.      These acts, as more fully stated herein, are all in violation of the Agreement and Ohio law.

615863                                                    2

7.     TQL seeks temporary, preliminary, and permanent injunctive relief as well as damages and its attorney's fees in addition to other relief.

## PARTIES

8.     TQL is an Ohio limited liability company that is engaged in the highly competitive business of providing freight brokerage services in every state in the continental United States.

9.     As a third party logistics company, TQL has no trucks of its own. Instead, it is a broker.  It links its customers with freight with over-the-road carriers. For its services, TQL receives a fee.

10.     TQL has expended substantial resources over many years to create and to protect the highly confidential information necessary to build and maintain a significant national business presence and to compete effectively against other freight brokerage services.

11.     The Former TQL Employees are individuals who were trained and employed by TQL.  Spinola began employment with TQL in September 2014.  Jacobs began employment with TQL in May 2013.  Ghebrehiwet began employment with TQL in February 2015.   Upon information and belief, they are presently employed by Transfix where they are in direct competition with TQL and in contact with TQL customers and carriers in violation of the Agreement.

12.     Upon information and belief, the Defendant Transfix is a third party logistics broker.  It conducts business in Ohio.  It directly competes, or is attempting to directly compete, with TQL in the freight brokerage industry.

## JURISDICTION AND VENUE

13.     This case was originally filed in Clermont County Court of Common Pleas.  Defendants Transfix and Spinola then removed this case to this Federal Court, stating that there is diversity of citizenship and that the amount in controversy is in excess of $75,000, excluding interest and costs.  Defendants Jacobs and Ghebrehiwet are, upon information and belief, citizens of Florida.  Therefore, diversity of citizenship continues to exist in this case.

14.     This Court has jurisdiction over the persons of the Defendants who are either located in Ohio, conduct their business in Ohio, have transacted business in Ohio, are intentionally causing tortious injury in Ohio, and/or have consented to this Court's jurisdiction.

## FORMER TQL EMPLOYEES BECAME EMPLOYED BY TQL AND SIGNED A NON-COMPETE AGREEMENT

15.     Spinola, Jacobs and Ghebrehiwet are former TQL employees.

16.     After hiring the Former TQL Employees, TQL provided them with extensive training on TQL's services, pricing structure, sales strategies, customers, and general operations.

17.     On average, it takes a new TQL employee eighteen weeks to complete the TQL training program.  With respect to the Former TQL Employees, TQL provided this training to them at considerable expense to itself.

18.     In addition, throughout their employment, TQL entrusted them with highly confidential business information and trade secrets, including information on TQL's specialized software, client relationships, pricing, marketing, sales lists, customer lists, motor carrier lists, and business strategy.

19.    TQL has protected the confidentiality of this information through a number of methods—including internal controls that prevent employees from downloading or printing certain information.    TQL also guards its confidential information with computer passwords.    TQL constantly changes these passwords in order to maintain secrecy.

20.    In addition, to protect its investment in its employees and to safeguard its confidential information from disclosure, TQL requires all of its employees to agree to TQL's "Employee Non-Compete, Confidentiality, and Non-Solicitation Agreement."

21.    The Former TQL Employees voluntarily signed the Agreement as a condition of their employment with TQL.

22.    By signing the Agreement and maintaining employment with TQL, the Former TQL Employees agreed to the following terms (among others):

a.    To maintain the secrecy of TQL's confidential information and to use such information only for TQL's benefit;

b.    To return to TQL all confidential and company information upon the termination of his employment or upon TQL's request;

c.    Not to solicit TQL customers for a period of one year following the termination of employment;

d.    Not to make use of or disclose TQL's confidential information and/or trade secrets;

e.    To refrain from recruiting certain TQL employees for a period of one year following termination of employment with TQL; and

f.    Not to compete against TQL or to work for a TQL competitor for a period of one year following termination of employment with TQL.

23.    Furthermore, under the express terms of their Agreement with TQL, the Former TQL Employees acknowledged that TQL develops and maintains certain

confidential information (including customer and carrier lists and pricing information) and that they would have access to this confidential information in order to perform their duties for TQL. The Former TQL Employees further acknowledged that their violation(s) of the Agreement would potentially entitle TQL to damages, equitable relief, costs, expenses, and its reasonable attorneys' fees.

## THE FORMER TQL EMPLOYEES JOIN TRANSFIX – A TQL COMPETITOR

24. Throughout their employment with TQL, TQL entrusted the Former TQL Employees with highly confidential business information and trade secrets including information on TQL's specialized software and client relationships. The Former TQL Employees also developed significant knowledge of and contacts with customers, carriers, and other persons doing business with TQL.

25. In their capacity with TQL, the Former TQL Employees had access to and gained knowledge of extremely sensitive information pertaining to TQL's services, its software, its personnel, its customer lists, its methods, procedures and practices, its commission and fee rates, its sales figures and other business affairs, and its strategic business forecasts and plans including marketing strategies and targets. That information is highly confidential and proprietary in nature and is protected by TQL as a valuable business asset.

26. Spinola's employment with TQL terminated on or about June 10, 2015. Jacobs' employment with TQL terminated on or about November 10, 2015. Ghebrehiwet's employment with TQL terminated on or about December 30, 2015.

27. After their employment terminated, the Former TQL Employees joined Transfix and began working in a position similar to the one that they held with TQL.

28. Transfix directly competes with TQL as third party logistics brokers.

29. At Transfix, upon information and belief, the Former TQL Employees have been in contact with TQL customers and carriers and attempted to and has converted TQL's business to Transfix.

30. Based on their positions with Transfix, the Former TQL Employees have and it is inevitable that they will use and disclose TQL's confidential and trade secret information to Transfix.

31. The Former TQL Employees are acting as logistics brokers, or some other position that competes with TQL, and are soliciting TQL customers in violation of their Agreement—the obligations of which run at least one year.

32. The Former TQL Employees have engaged in a purposeful course of conduct to unjustly enrich themselves by using the skills, contacts, business relationships, and knowledge developed by TQL – all to the competitive disadvantage of TQL.

33. The Former TQL Employees have engaged in a purposeful course of conduct to misappropriate the confidential and proprietary business information and trade secrets of TQL.

34. Upon information and belief, the Former TQL Employees intend, unless restrained, to continue to be employed by Transfix, in direct competition with TQL, to misappropriate and convert business opportunities and trade secrets of TQL, to assist others in the misappropriation and unauthorized use of TQL's trade secrets and confidential information, and to unjustly enrich themselves and Transfix by using the

skills, contacts, business relationships, methods, and knowledge developed by TQL – all to their competitive advantage.

35.     Upon information and belief, Transfix has interfered with TQL's business relationships to the competitive disadvantage of TQL.

### FIRST CLAIM FOR RELIEF
### (Breach of Contract)

36.     Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

37.     The Former TQL Employees entered into their Agreement with TQL.

38.     The Agreement is reasonable.

39.     Through their acts and/or the acts of his agents, the Former TQL Employees breached his Agreement.

40.     TQL has fully complied with the terms of the Agreement.

41.     The Former TQL Employees' breach of their Agreement has caused and will continue to cause TQL to sustain substantial monetary losses and other immediate, substantial, and irreparable harm for which there is no adequate remedy at law.

### SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty)

42.     Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

43.     The Former TQL Employees owed fiduciary duties to TQL due to their positions as employees of TQL and due to the confidential information shared with them for their use on behalf of TQL.

44.     The Former TQL Employees' fiduciary relationship imposed duties of good faith, loyalty, and honesty on them.

45.     By (among other things) misappropriating confidential and trade secret information belonging to TQL and assisting and working with a competitor, the Former TQL Employees have breached their fiduciary duty, all to the injury and damage of TQL, and will continue to do so to TQL's irreparable harm unless they are restrained and enjoined.

### THIRD CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets)

46.     Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

47.     TQL maintains confidential information pertaining to, among other things, its specialized software, pricing, services, personnel, customer lists, motor carrier lists, methods, procedures and practices, its commission and fee rates, its sales figures, the customer relationships and productivity of its sales employees, and other business affairs as confidential and proprietary information.

48.     This confidential business information constitutes a valuable business asset of TQL and is unknown to the general public and to the freight brokerage industry.

49.     This confidential business information derives independent economic value from not being generally known to, and not being readily ascertainable by proper means by, TQL's competitors.

50.     The confidential information has been developed through the years by TQL at the expense of and for the exclusive benefit of TQL, and TQL has taken reasonable steps to maintain the secrecy of the information.

51.     This information constitutes trade secrets under the Ohio Uniform Trade Secrets Act, §1333.61 through §1333.69 of the Ohio Revised Code.

52.     As a TQL employee, the Former TQL Employees had detailed and comprehensive knowledge of TQL's trade secrets and confidential information.

53.     The Former TQL Employees have begun employment with Transfix – a TQL competitor.

54.     Their positions with Transfix are similar to the positions they held during their former employment with TQL.

55.     The Former TQL Employees have misappropriated and, unless restrained, will continue to misappropriate trade secrets of TQL to their own use and the use of Transfix.

56.     The Former TQL Employees have disclosed TQL trade secrets and confidential information to other employees and/or members of Transfix who are wrongfully using this information to compete with TQL.

57.     By their acts and conduct, Transfix and the Former TQL Employees and their agents have violated and are continuing to violate the Ohio Uniform Trade Secrets Act.

58.     By their acts and conduct, Transfix and the Former TQL Employees have unjustly enriched themselves and have caused and are continuing to cause TQL actual and potential loss of business opportunities, loss of good will in the freight brokerage

615863

10

industry, and loss due to legal expenses and costs, including attorneys' fees, or will do so unless they are restrained.

59.     This misappropriation of trade secrets by Defendants and their agents has caused and will continue to cause other immediate, substantial and irreparable harm to TQL, for which there is no adequate remedy at law.

## FOURTH CLAIM FOR RELIEF
### (Intentional Interference with Contract and Unfair Competition)

60.     Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

61.     Transfix had knowledge of the Agreement and the terms at all relevant times.

62.     Transfix caused the Former TQL Employees to compete with TQL, to divulge the trade secrets of TQL, and to wrongfully convert the business opportunities of TQL to the benefit of Transfix.

63.     Transfix has intentionally, maliciously, and wrongfully caused the Former TQL Employees to breach their Agreement.

64.     By reason of the conduct of Transfix, TQL has been and continues to be damaged and deprived of benefits to which it is entitled pursuant to the Agreement.

65.     Transfix has been unjustly enriched as a direct and proximate result of its intentional interference and unfair competition, and Transfix must disgorge profits and gain derived from its wrongful acts.

## FIFTH CLAIM FOR RELIEF

66.     Plaintiff incorporates the allegations of the preceding paragraphs as if fully set forth herein.

67. The actions of Defendants described above were willful, wanton, intentional and demonstrated fraud, insult, malice, and/or a disregard to the rights of TQL.

68. As a direct and proximate result thereof, TQL is entitled to punitive damages against Defendants.

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiff TQL demands that judgment be entered in its favor against the Defendants as follows:

A.   Awarding temporary, preliminary, and permanent injunctive relief against Defendants and their agents, and enforcing Paragraph 9 of the Agreement and all subparagraphs contained therein for one year from the Court's final Order; and

B.   Awarding compensatory damages in excess of $25,000;

C.   Awarding punitive damages;

D.   Awarding prejudgment interest;

E.   Awarding the costs and expenses incurred in connection with this litigation, including reasonable attorney's fees;

F.   Awarding any other relief as this Court deems appropriate.

615863

Respectfully submitted,


/s/ *Barry F. Fagel*

Barry F. Fagel                    (#0060122)
LINDHORST & DREIDAME
312 Walnut Street, Suite 3100
Cincinnati, Ohio  45202
(513) 421-6630
(513) 421-0212 (fax)
bfagel@lindhorstlaw.com
**Attorneys for Plaintiff**
**Total Quality Logistics, LLC**


**TO THE CLERK:**

Please serve Defendants by certified mail, return receipt requested.  Thank you.

615863                                    13

## TOTAL QUALITY LOGISTICS, LLC

### CONFIDENTIALITY AGREEMENT AND RESTRICTIVE COVENANT

### Florida

THIS CONFIDENTIALITY AGREEMENT AND RESTRICTIVE COVENANT ("the Agreement"), is made and entered into on _September 15th_ , 20_14_ by and between TOTAL QUALITY LOGISTICS, LLC ("TQL" or "the Company") and _Anthony Spinola_ ("the Employee").

### RECITALS:

WHEREAS, the Company is an Ohio Limited Liability Company that operates in the State of Florida. The Company is engaged in providing shipping services, third-party logistic services, freight brokerage services, truck brokerage services, and supply-chain management services throughout the Continental United States. References to TQL in this Agreement refer to TQL, its parent and subsidiary corporations, all related entities, and its successors and assigns;

WHEREAS, The Company is unique within the organizations providing shipping services, third-party logistic services, freight brokerage services, truck brokerage services, and supply-chain management services (the "Industry"). The Company has spent extensive time developing relationships with Customers, Carriers, suppliers and others within the Industry. TQL provides extensive training on ways to succeed within the Industry. TQL also provides tools, such as proprietary software, that are unique within the Industry. The relationships, tools, and training developed by TQL will assist Employee in gaining intimate knowledge of TQL's business model, its Customers, Carriers, suppliers, contact information, lanes, pricing, sales strategy, service and other confidential and proprietary information. The knowledge learned at TQL is unlike what could be learned elsewhere within the Industry. TQL takes steps to protect the confidentiality of this information and it would have value to a TQL competitor. Employee, therefore, acknowledges and agrees that what Employee learns at and is trained in at TQL would necessarily cause unfair competition if Employee took employment competitive to TQL;

WHEREAS, TQL develops and maintains confidential, proprietary information (hereinafter referred to as "Confidential Information"), as defined in this Agreement;

WHEREAS, Employee agrees that any and all such Confidential Information set forth above, whether or not formally designated as such, is vital to the success of TQL's business and Employee understands that all such Confidential Information is the exclusive property of TQL, that it is to be treated and maintained as confidential proprietary information by Employee, and that it is treated and maintained as confidential, proprietary information by TQL;

WHEREAS, in order to allow TQL to remain effective and competitive in the marketplace in which it conducts its business, and to maintain its business relationships

FL                                        1

EXHIBIT

A

Initials: _A.S._

on the basis of trust and confidence, it is essential that all Confidential Information remain protected from unauthorized disclosure, dissemination, and use, except as authorized and required by TQL to enable Employee to properly perform his or her work in the normal course of TQL's business;

WHEREAS, Employee acknowledges that unauthorized use or disclosure of Confidential Information as defined herein would cause, or be likely to cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL;

WHEREAS, Employee acknowledges that TQL's Customer and Carrier lists, other information about TQL's Customers and Carriers, its Load Management System, and other Confidential Information, are proprietary trade secrets with significant economic value, are compiled through a substantial investment of time and money by TQL, and are not common knowledge throughout the shipping, third-party logistics, freight brokerage, truck brokerage, and supply-chain management services industry;

WHEREAS, in the course and scope of employment by TQL, Employee must be given access to such Confidential Information from time-to-time or continuously, in order to effectively perform his or her job duties;

WHEREAS, TQL will not agree to employ or continue to employ Employee, unless Employee signs this Agreement and is bound by it;

WHEREAS, the Company has a strong and legitimate business interest in preserving and protecting its investments including, but not limited to, its specialized training, its Confidential Information, its trade secrets and its good will; and

WHEREAS, the Company desires to preserve and protect its legitimate business interests and Confidential Information further by prohibiting competitive activities of the Employee during his or her employment with the Company and by preventing unfair and unlawful competitive activities by Employee following termination of his or her employment with the Company.

NOW THEREFORE, in consideration of the employment or continued employment by the Company of the Employee and other good and valuable consideration the receipt and sufficiency of which is acknowledged by the Employee, the Company and the Employee agree:

1. Recitals. The "Recitals" set forth above are hereby restated and incorporated herein by reference as though fully set forth herein.

2. Employment. Employer employs Employee as an employee at will, and nothing in this Agreement changes Employee's status as an at-will employee. Either TQL or Employee may terminate Employee's employment for any reason at any time. Employee agrees to undertake and assume the responsibility for performing for and on behalf of TQL whatever duties shall be assigned to Employee by TQL at any time from

time to time. It is further understood that TQL retains the right to modify Employee's duties at any time and, in its discretion, determine Employee's compensation, including, but not limited to, any salary, other cash compensation and benefits.

3. <u>Confidential Information – Defined</u>. The Employee recognizes, acknowledges and agrees that TQL develops and maintains confidential, proprietary information (referred to herein as "Confidential Information"), including but not limited to, its operating policies and procedures; computer data bases; computer software; methods of computer software development and utilization; computer source codes; financial records, including but not limited to, credit history and information about Customers and potential Customers, Carriers, and suppliers; information about transactions, pricing, the manner and mode of doing business, and the terms of business dealings and relationships with Customers and Carriers, financial and operating controls and procedures; contracts and agreements of all kinds, including those with Customers, Carriers, and vendors; pricing, marketing and sales lists and strategies; Customer lists and Carrier lists including contact names, addresses, telephone numbers, and other information about them; trade secrets; correspondence; accounts; business policies; purchasing information; functions and records; logistics management; and data, processes, and procedures. Confidential Information also includes any information described above which TQL obtains from another company and which TQL treats as proprietary or designates as Confidential Information, whether or not owned or developed by TQL. This information may be in tangible written form, computer databases, or it may be represented and communicated solely by oral expressions or business activities which are not reduced to written form. Confidential Information includes all information developed, acquired and maintained by Employee in the course of his or her employment with the Company as it may exist from time to time, and whether or not it is maintained on the Employee's personal computer, laptop, or other equipment personally owned by the Employee, and is the property of the Company. Further, Confidential Information may be protected by patents, copyrights, or other means of protection; and further includes, without limitation:

(a) All documents describing, and all information and knowledge regarding, procedures or methods employed by the Company in soliciting, procuring, and handling the Company's customers and business, including working and billing procedures;

(b) All information acquired by the Company relating to prospective and current business transactions and arrangements;

(c) All market analyses and/or demographic market analyses and/or demographic information or studies of the current and/or potential markets of interest to the Company;

(d) All understandings between or among the Company and other persons;

FL                                   3                      Initials: _A.S._

(e)     All documents provided to the Company in confidence by third parties;

(f)     All legal documents and correspondence concerning the Company;

(g)     All opinions, decisions, rulings, and audits of governmental agencies relating to the Company;

(h)     All files concerning the Company's customers and prospective customers, and the contents of such files; and

(i)     All other information specifically designated "Confidential" by the Company.

4.     Confidential Information – Admissions and Agreements.  The Employee admits and agrees that such Confidential Information is a valuable, special and unique asset of the Company's business that gives the Company advantage over its actual and potential competitors, and the Employee further admits and agrees that:

(a)     The Company has implemented such practices and measures as are reasonably necessary to preserve and to protect the confidentiality of such Confidential Information;

(b)     The Employee has access to such Confidential Information;

(c)     The Employee has been instructed about, and knows and understands the value and importance of such Confidential Information;

(d)     The Employee, by reason of the trust relationship arising between the Company and him or her, owes the Company a fiduciary duty to preserve and protect such Confidential Information from all unauthorized disclosure or unauthorized use;

(e)     Such Confidential Information constitutes "trade secrets";

(f)     Unauthorized disclosure or unauthorized use of such Confidential Information would irreparably injure the Company;

(g)     The Employee agrees to immediately assemble, produce and return all of the Company's Confidential Information in the Employee's possession at any time during the course of his or her employment with the Company upon the request or demand of the Company; and

(h)     The Employee agrees to return all of the Company's Confidential Information and to delete the Company's Confidential Information from any personal computer (or similar device) of Employee upon the termination of Employee's employment with the Company. The Employee further consents to permit the Company

FL                                        4                          Initials: ___

to inspect and delete all of the Company's Confidential Information from the Employee's personal computers, laptops and other equipment including any personal computer maintained by the Employee at his or her home or elsewhere. Upon Company's request, the Employee agrees to execute a written statement under oath swearing that all of the Confidential Information of the Company that the Employee previously maintained upon his or her personal computer, if any, has been deleted. The Employee further agrees that the Company shall have no obligation to pay any further compensation or remuneration to the Employee unless and until such time as the Employee provides his or her written statement under oath as contemplated by this Paragraph.

5. <u>Confidential Information – Prohibited Acts</u>. The Employee understands and agrees that all Confidential Information is to be preserved and protected, is not to be disclosed or made available, directly or indirectly, to third persons for purposes unrelated to the business objectives of the Company without prior written authorization of an executive officer of the Company, and is not to be used, directly or indirectly, for purposes unrelated to the business objectives of the Company without prior written authorization of an executive officer of the Company; specifically, and without modifying or limiting the Agreement, the Employee understands and agrees that, except in the ordinary course of conducting business for the Company, no Confidential Information, nor any part of it, either in original form or in duplicating or copied form, is to be (i) removed at any time from the premises of the Company, or (ii) disclosed or made available, verbally, by electronic transmission, or by any other form or manner of communication, to any person, firm, corporation, association, or any other legal entity for any reason or purposes whatsoever, without prior written authorization of an executive officer of the Company.

Employee agrees that Employee's engaging in any form of employment relationship with a Competing Business, as defined herein would necessarily result in Employee revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

For purposes of this Agreement, the term: (i) "Customer" is any individual, business, or other entity, for whom TQL has rendered any service, or with respect to which TQL has planned and/or made contact for the purpose of rendering any service, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (ii) the term "Carrier" is any over-the-road shipper, motor carrier, trucker, or hauling business or otherwise defined in 49 USC §13102(3) that has transported freight for any TQL Customer as a result of a relationship, dealings, arrangements, or communications with TQL, or with respect to which TQL has planned and/or made contact for this purpose, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (iii) the term "Competing Business" is any person, firm, corporation, or entity that is engaged in third-party logistics, freight brokerage, truck brokerage, or supply-chain management services anywhere in the Continental United States; and (iv) the term "solicit" includes but is not limited to, any efforts in any form, intended to take business away from, intercept or interfere with the business of TQL, including relationships with TQL and its

FL                                             5

Initials: A.S.

employees, Customers, Carriers, clients, consultants, suppliers, vendors, lessees, lessors, and employees, and specifically, including doing business with any Customer or Carrier.

6. Confidential Information – Continuing Obligations. The Employee understands and agrees that his obligations under this Agreement, specifically including the obligations to preserve and protect and not to disclose (or make available) to third parties consistent with applicable law, continue indefinitely and do not, under any circumstances or for any reason, whether voluntarily or involuntarily, specifically including wrongful discharge, cease upon termination of employment; and that, in the event of termination of the Employee's employment for any reason, specifically including wrongful discharge, such Confidential Information shall remain the sole property of the Company and shall be left in its entirety in the undisputed possession and control of the Company after such termination. Employee agrees to inform all prospective or future employers of the Employee's obligations under the provisions of this Agreement.

7. Confidential Information – Proprietary Interest. The Employee understands and agrees that all such Confidential Information is and shall remain, at all times, the sole property of the Company; that he or she obtains no proprietary interest in any Confidential Information developed or acquired in the course of his employment with the Company; and that it shall be no defense to an action brought to enforce the confidentiality provisions of this Agreement that the Employee developed or acquired, in whole or in part, the Confidential Information disclosed or used without authorization.

8. Confidential Information – Protected Whether Information of Parent or Subsidiaries. That Employee recognizes, acknowledges, and agrees that this Agreement is specifically and expressly intended to protect, and does specifically and expressly protect all Confidential Information of the Company, whether in the possession, custody or control of the Company, its employees, officers, agents or any other affiliated, parent or subsidiary company.

9. Restrictive Covenant. During employment with the Company, and for a period of one (1) year immediately following termination of his employment, whether voluntarily or involuntarily, by wrongful discharge or for any other reason whatsoever, the Employee shall not (directly or indirectly, either as an individual on his own account or as a partner, joint venturer, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise) contact, solicit or accept business from, render any services, give assistance to or accept any compensation from any Customer or customer prospect of the Company. A customer prospect is any business, company, individual, partnership or entity, including former Customers, with which the Company or any of its employees, including but not limited to the Employee, had contact for the purpose of soliciting business, developing a business relationship, or discussing existing or potential services of the Company within the twelve (12) months immediately preceding the Employee's termination or cessation of employment.

FL                                          6                          Initials: 

Further, Employee hereby agrees that he or she shall not, directly or indirectly, enter into, participate in, consult with, or engage in, any business in competition with the business of the Company, or with any Competing Business, as it now exists or may exist in the future, either as an individual or on his own account, or as a partner, joint venturer, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise, for a period of one (1) year after the date of the termination of Employee's employment with the Company.

This Agreement on the part of the Employee, is given and made by the Employee to induce the Company to employ or continue to employ the Employee for a position of trust and confidence and to enter into this Agreement with the Employee, and the Employee hereby acknowledges the sufficiency of the consideration of this Restrictive Covenant.

It is further understood and agreed that the running of the one (1) year set forth in this Paragraph shall be tolled during any time period during which Employee violates any provision of this Agreement.

This Restrictive Covenant shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of the Employee against the Company, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this Restrictive Covenant.

The refusal or failure of the Company to enforce this Restrictive Covenant against any other employee or ex-employee, for any reason, shall not constitute a defense to the enforcement by the Company of this Restrictive Covenant, nor shall it give rise to any claim or cause of action by such employee or ex-employee against the Company.

If any portion of this Restrictive Covenant is held by a Court of competent jurisdiction to be unreasonable, arbitrary, against public policy for any reason, or invalid for any reason, the Restrictive Covenant shall be considered divisible, as to time, to geographical area, and to restrictive scope; each month of the specified period shall be deemed a separate period, each square mile within the restricted territory shall be deemed a separate geographical area, and each customer and customer prospect shall be deemed a separate area of restriction so that the lesser period or area of restriction shall remain effective so long as such lesser restriction is not unreasonable, arbitrary, or against public policy for any reason. The Company and the Employee agree that, if a Court of competent jurisdiction should determine the specified period or the scope of the restriction to be unreasonable, arbitrary or against public policy for any reason, a lesser period or restrictive scope that is determined to be reasonable non-arbitrary, and not against public policy for any reason, may be enforced by the Company against the Employee.

10. <u>Confidential Information – Remedies.</u> If an action should have to be brought by the Company against the Employee to enforce the provisions of this

FL            7            Initials: _A.S._

Agreement, the Employee recognizes, acknowledges and agrees that the Company is entitled to all civil remedies including without limitation:

(a) Preliminary and permanent injunctive relief restraining the Employee from any unauthorized disclosure or use of any Confidential Information, in whole or in part, and from rendering any service to any person, firm, corporation, association, or other legal entity to whom or to which such Confidential Information, in whole or in part, has been disclosed or is threatened to be disclosed; and

(b) Actual damages, attorneys' fees in the trial and appellate courts, costs and expenses of investigation and litigation, including expert witness fees and other costs and expenses; and all other remedies available under law.

Nothing in this Agreement shall be construed as prohibiting the Company from pursuing any other legal or equitable remedies available for breach or threatened breach of the provisions of this Agreement, and the existence of any claim or cause of action of the Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any of the provisions of this Agreement.

11. <u>Restrictive Covenant – Remedies</u>. The Company and the Employee agree that, in the event of a breach by the Employee of the Restrictive Covenant set forth above, such a breach would irreparably injure the Company and would leave the Company with no adequate remedy at law, and the Company and the Employee further agree that, if an action should have to be brought by the Company against the Employee to enforce the Restrictive Covenant, the Company shall be entitled to all available civil remedies under Ohio and/or Florida statutes and case law. The remedies available to Employer against Employee shall further include, without limitation:

(a) Preliminary and permanent injunctive relief restraining the Employee from violating, directly or indirectly, either as an individual, on his own account or as a partner, joint venturer, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise, the competitive restriction of Paragraph 9 above; and

(b) Actual damages, attorneys' fees in the trial, appellate courts; costs and expenses of investigation and litigation, including expert witness fees and other costs and expenses, and all other remedies available under law.

Nothing in this Agreement shall be construed as prohibiting the Company from pursing any other legal or equitable remedies available to it for breach or threatened breach of the Restrictive Covenant, and the existence of any claim or cause of action of the Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of the Restrictive Covenant.

FL                                   8                        Initials: _____

Should an action have to be brought by the Company against the Employee to enforce the Restrictive Covenant, the period of restriction shall be deemed to begin running on the date of entry of an Order granting the Company preliminary injunctive relief, and shall continue uninterrupted for the next succeeding one (1) year; the Employee acknowledges and agrees that the intent and purpose of the Restrictive Covenant is to preclude him or her from competing with the Company for a full one (1) year period, and that such purpose and effect would be frustrated by measuring the period of restriction from the date of termination of employment where the Employee failed to honor the Restrictive Covenant, until directed to do so by Court Order.

12. <u>Property Rights and Assignment</u>. Employee agrees that any work, invention, product design, or technological innovation created, conceived, developed, produced, generated, and/or improved by Employee, whether or not patentable, or subject to copyright, trademark, or trade secret protection, at any time during or arising out of Employee's employment with TQL that results from, is suggested by, or relates to any work which Employee does for TQL, shall be the absolute property of TQL and shall promptly be disclosed by Employee to TQL. Employee hereby assigns any and all right, title, and interest in any work product to TQL, including assigning any and all rights to any future invention arising out of or relating to Employee's employment with TQL. To the extent necessary, during employment and thereafter, Employee shall sign applications, assignments, and any other papers that TQL may consider necessary or helpful in perfecting and enforcing TQL's rights in, and to, any such invention, improvement, and/or technological innovation.

13. <u>Consideration</u>. The Employee expressly acknowledges and agrees that the execution by the Company of this Agreement and the obligations of the Company under this Agreement constitute full, adequate, and sufficient consideration to the Employee from the Company for the duties, obligations, and covenants of the Employee under this Agreement, including, by way of illustration and not by way of limitation, the agreements, covenants, and obligations of the Employee under Paragraphs 4, 5, 6, 7, 8, 9 and 12 of this Agreement. The Company expressly acknowledges and agrees similarly with respect to the consideration received by it from the Employee under this Agreement.

14. <u>Personnel Policies</u>. Employee agrees to abide by TQL's rules, regulations, policies and practices, written and to the extent that Employee has actual knowledge thereof, unwritten, as they may from time to time be adopted or modified by TQL at its sole discretion. TQL's written rules, policies, practices and procedures shall be binding on Employee unless superseded by or in conflict with this Agreement, in which case this Agreement shall govern. However, such rules, policies, practices and procedures are not part of this Agreement and whether written, oral or implied, shall not create any contract between Employee and TQL at any time. Additional contractual obligations or other modifications of this agreement may be made only by an express written agreement between Employee and TQL.

15. <u>Notices</u>. Any and all notices that shall be given pursuant to this Agreement shall be in writing, shall be either actually delivered or sent by United States

mail, return receipt requested, and shall be addressed to the parties at the addresses shown on the signature page of this Agreement.

16.     <u>Consent to Jurisdiction and Venue – Waiver of Jury Trial</u>.  The Employee hereby consents to jurisdiction and venue for any action brought by the Company arising out of a breach or threatened breach of this Agreement shall be brought in the Court of Common Pleas, Clermont County, Ohio or the United States District Court located in the jurisdiction where the office of your employment is located, and the Employee hereby agrees that any controversy which may arise under this Agreement or the relationship established by this Agreement would involve complicated and difficult factual and legal issues and that, therefore, any action brought by the Company against the Employee or brought by the Employee, alone or in combination with others, against the Company, whether arising out of this Employment Agreement or otherwise, shall be determined by a judge sitting without a jury.

17.     <u>Acknowledgment</u>.  The Employee hereby acknowledges that he or she has been provided with a copy of this Agreement for review prior to signing it, that he or she has been given the opportunity to have this Agreement reviewed by his or her own attorney prior to signing it, that he or she understands the purposes and effects of this Agreement, and that he or she has been given a signed copy of this Agreement for his or her own records.

18.     <u>Waiver of Breach</u>.  The waiver by the Company of a breach or threatened breach of any provision of this Agreement by the Employee shall not be construed as a waiver of any subsequent breach of the Employee.

19.     <u>Assignability</u>.  This Agreement shall be binding upon and inure to the benefit of Employer, its successors, and assigns, and shall be binding upon and inure to the benefit of Employee, his/her personal representatives, estate, heirs, and designated beneficiaries.

20.     <u>Rules of Construction</u>.

(a)     <u>Entire Agreement</u>.    This Agreement constitutes the entire agreement between the Company and the Employee pertaining to the subject matters hereof, and it supersedes all negotiations, preliminary agreements, and all prior and contemporaneous discussions and understandings of the parties in connection with the subject matters hereof.  Except as otherwise provided, no covenant, representation, or condition not expressed in either this Agreement or an amendment hereto made and executed in accordance with the provisions of Subparagraph (b) of this paragraph shall be binding upon the parties hereto or shall affect or be effective to interpret, change, restrict or terminate the provisions of this Agreement;

(b)     <u>Amendments</u>.  No change, modification, or termination of any of the terms, provisions or conditions of this Agreement shall be effective unless made in writing and signed or initialed by all parties to this Agreement;

(c)     Governing Law.  This Agreement shall be governed and construed in accordance with the statutory and decisional law of the State of Ohio first, and Florida law if necessary;

(d)     Severability.  If any paragraph, subparagraph or provision of this Agreement, or the application of such paragraph, subparagraph or provision is held invalid, the remainder of the agreement, and the application of such paragraph, subparagraph, or provision to persons or circumstances other than those with respect to which it is held invalid, shall not be affected thereby;

(e)     Headings and Captions.  The titles and captions of paragraphs and subparagraphs contained in this Agreement are provided for convenience or reference only, and they shall not be considered a part of this Agreement; such titles or captions are not intended to define, limit, extend, explain, or describe the scope or extent of this Agreement or any of its terms, provisions, representations, warranties, conditions, etc., in any manner or in any way whatsoever.

(f)     Gender and Number.  All pronouns shall be deemed to refer to the masculine or feminine, and to the singular or plural, as the identity of the person or persons may require; and

(g)     Continuance of Agreement.  The rights, responsibilities and duties of the Company and the Employee, and the covenants and agreements contained in this Agreement shall survive the execution of this Agreement, shall continue to bind the parties to this Agreement, shall continue in full force and effect until each and every obligation of the parties pursuant to this Agreement shall have been performed, and shall be binding upon the successors and assigns of the parties.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above-written.

WITNESSES:

TOTAL QUALITY LOGISTICS, LLC
"Company"

By: _____
Print: Ralph O Lee
Address: 4289 Ivy Pointe Blvd
          Cincinnati, OH 45245

_____

_____

"Employee"

_____

Print: Anthony Spinola
Address: 1223 Rodeaux Circle
          Sanford, Florida 32771

_____ Mehemed Hassan

# TOTAL QUALITY LOGISTICS, LLC
## Ohio

## Employee Non-Compete, Confidentiality
## And Non-Solicitation Agreement

This EMPLOYEE NON-COMPETE, CONFIDENTIALITY AND NON-SOLICITATION AGREEEMNT ("Agreement"), is entered into by and between TOTAL QUALITY LOGISTICS, LLC ("TQL"), 4289 Ivy Pointe Blvd., Cincinnati, Ohio 45245 and the Employee whose name and address are set forth below his or her signature on the last page of this Agreement ("Employee").

### Recitals:

**WHEREAS**, TQL is an Ohio Corporation providing shipping services, third-party logistic services, freight brokerage services, truck brokerage services, and supply-chain management services throughout the Continental United States. References to TQL in this Agreement refer to TQL, its parent and subsidiary corporations, all related entities, and its successors and assigns; and

**WHEREAS**, TQL is unique within the organizations providing shipping services, third-party logistic services, freight brokerage services, truck brokerage services, and supply-chain management services (the "Industry"). TQL has spent extensive time developing relationships with Customers, Motor Carriers, suppliers and others within the Industry. TQL provides extensive training on ways to succeed within the Industry. TQL also provides tools, such as proprietary software, that are unique within the Industry. The relationships, tools, and training developed by TQL will assist Employee in gaining intimate knowledge of TQL's business model, its Customers, Motor Carriers, suppliers, contact information, lanes, pricing, sales strategy, service and other confidential and proprietary information. The knowledge learned at TQL is unlike what could be learned elsewhere within the Industry. TQL takes steps to protect the confidentiality of this information and it would have value to a TQL competitor. Employee, therefore, acknowledges and agrees that what Employee learns at and is trained in at TQL would necessarily cause unfair competition if Employee took employment competitive to TQL; and

**WHEREAS**, TQL develops and maintains confidential proprietary information (hereinafter referred to as, "Confidential Information"), including but not limited to, its operating policies and procedures; computer data bases; computer software; methods of computer software development and utilization; computer source codes; financial records, including but not limited to, credit history and information about Customers and potential Customers, Motor Carriers, and suppliers; information about transactions, pricing, the manner and mode of doing business, and the terms of business dealings and relationships with Customers and Motor Carriers, financial and operating controls and procedures; contracts and agreements of all kinds, including those with Customers,

1



Initials AJ

Motor Carriers, and vendors; pricing, marketing and sales lists and strategies; Customer lists and Motor Carrier lists including contact names, addresses, telephone numbers, and other information about them; trade secrets; correspondence; accounts; business policies; purchasing information; functions and records; logistics management; and data, processes, and procedures. Confidential Information also includes any information described above which TQL obtains from another company and which TQL treats as proprietary or designates as Confidential Information, whether or not owned or developed by TQL. This information may be in tangible written form, computer databases, or it may be represented and communicated solely by oral expressions or business activities which are not reduced to written form. Confidential Information may be protected by patents, copyrights, or other means of protection; and

WHEREAS, Employee agrees that any and all such Confidential Information set forth above, whether or not formally designated as such, is vital to the success of TQL's business and Employee understands that all such Confidential Information is the exclusive property of TQL, that it is to be treated and maintained as confidential proprietary information by Employee, and that it is treated and maintained as confidential proprietary information by TQL; and

WHEREAS, in order to allow TQL to remain effective and competitive in the marketplace in which it conducts its business, and to maintain its business relationships on the basis of trust and confidence, it is essential that all Confidential Information remain protected from unauthorized disclosure, dissemination, and use, except as authorized and required by TQL to enable Employee to properly perform his or her work in the normal course of TQL's business; and

WHEREAS, Employee acknowledges that unauthorized use or disclosure of Confidential Information as defined herein would cause, or be likely to cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL; and

WHEREAS, Employee acknowledges that TQL's Customer and Motor Carrier lists, other information about TQL's Customers and Motor Carriers, its Load Management System, and other Confidential Information, are proprietary trade secrets with significant economic value, are compiled through a substantial investment of time and money by TQL, and are not common knowledge throughout the shipping, third-party logistics, freight brokerage, truck brokerage, and supply-chain management services industry; and

WHEREAS, in the course and scope of employment by TQL, Employee must be given access to such Confidential Information from time-to-time or continuously, in order to effectively perform his or her job duties; and

WHEREAS, TQL will not agree to employ or continue to employ Employee, unless Employee signs this Agreement and agrees to be bound by it.

Initials AJ

**NOW THEREFORE,** in consideration of the employment or continued employment of Employee by TQL, including compensation and benefits provided by TQL, and the terms conditions, and covenants, set forth herein, TQL and Employee agree as follows:

1.  <u>Recitals</u>.    The "Recitals" set forth above are hereby restated and incorporated herein by reference as though fully set forth again.

2.  <u>Employee Duties</u>.  Employee shall undertake and assume the responsibility of performing for and on behalf of TQL whatever duties shall be assigned to Employee by TQL at any time and from time-to-time.  It is further understood that TQL retains the right to modify Employee's duties at any time and, in its discretion, determine Employee's compensation, including but not limited to, any salary, other cash compensation, and benefits.

3.  <u>At-will Employment</u>.  Employee is an employee at-will. Nothing in this Agreement changes Employee's status as an at-will employee.  Either TQL or Employee may terminate Employee's employment for any reason at any time.

4.  <u>TQL Owns Confidential Information</u>.    All Confidential Information as described herein is proprietary and the sole property of TQL.

5.  <u>Confidential Information is for TQL's Use Only</u>.  Unless Employee has prior written consent from TQL, Employee shall not at any time during the course of his or her employment by TQL, and at all times thereafter, use for any purpose or publish, copy, disclose, or communicate to any individual, firm, corporation, or other business entity other than TQL, any Confidential Information, except as properly necessary and authorized by TQL in the conduct of TQL's business.  Employee agrees that all information disclosed to Employee or to which Employee has access during the period of his or her employment shall be presumed to be Confidential Information hereunder if there is any reasonable basis to believe it to be Confidential Information or if TQL appears to treat it as confidential.

6.  <u>Return of Company Property</u>. Upon termination of employment or upon request by TQL for any reason, Employee will immediately deliver to TQL all originals and all copies of all documents and other materials obtained from or belonging to TQL, including but not limited to all Confidential Information, regardless of form, in Employee's possession, custody or control, including but not limited to any TQL files, documents (including any containing customer information), computer data, or other media however stored, and Employee will retain no copy of any such document, data or other materials.

7.  <u>Presumption Regarding Confidential Information</u>. Employee agrees that Employee's engaging in any form of employment relationship with a Competing Business, as defined in Section 9 below, would necessarily result in Employee revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

Initials AJ

8.    Property Rights and Assignment.  Employee agrees that any work, invention, product design, or technological innovation created, conceived, developed, produced, generated, and/or improved by Employee, whether or not patentable, or subject to copyright, trademark, or trade secret protection, at any time during or arising out of Employee's employment with TQL that results from, is suggested by, or relates to any work which Employee does for TQL, shall be the absolute property of TQL and shall promptly be disclosed by Employee to TQL.  Employee hereby assigns any and all right, title, and interest in any work product to TQL, including assigning any and all rights to any future invention arising out of or relating to Employee's employment with TQL.  To the extent necessary, during employment and thereafter, Employee shall sign applications, assignments, and any other papers that TQL may consider necessary or helpful in perfecting and enforcing TQL's rights in, and to, any such invention, improvement, and/or technological innovation.

9.    Covenants and Remedies.

(a)    Agreement to Covenants and Material Breach.  The Employee hereby covenants and agrees to the terms and conditions of the restrictive covenants and agreements set forth in Sections 4 through 9 of this Agreement, and agrees that any breach thereof shall constitute a material breach by the Employee of his or her obligations under this Agreement.

(b)    Covenants.  Employee agrees that, during the course of his or her employment (except as required in the course of Employee's employment with TQL), and for a period of one (1) year after termination or cessation of Employee's employment for any reason:

(i)    Employee will not, directly or indirectly, own, operate, maintain, consult with, be employed by (including self-employment), engage in, or have any other interest (whether as an owner, shareholder, officer, director, partner, member, employee, joint venture, beneficiary, independent contractor, agent, or any other interest) in any Competing Business (as defined below), except the ownership of less than 1% of the outstanding equity securities of any publicly-held corporation or entity;

(ii)    Employee will not directly or indirectly, either as an employee, agent, consultant, contractor, officer, owner, or in any other capacity or manner whatsoever, whether or not for compensation, participate in any transportation-intermediary business that provides services anywhere in the Continental United States, including but not limited to any person or organization that provides shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services;

(iii)    Employee will not, directly or indirectly, solicit any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor, or take any action, to divert business from TQL;

(iv)    Employee will not, directly or indirectly, interfere with, tamper with, disrupt, or attempt to disrupt any contractual or other relationship, or prospective

4                    Initials A̲J̲

relationship, between TQL and any Customer, Motor Carrier, client, consultant, supplier, vendor, lessee, or lessor of TQL; and

        (v)   Employee will not, directly or indirectly employ, recruit, solicit, or assist others in employing, recruiting, or soliciting any person who is, or within the previous twelve (12) months has been, an employee of, consultant with, or been party to another business relationship with TQL.

        It is further understood and agreed that the running of the one (1) year set forth in Paragraph 9 shall be tolled during any time period during which Employee violates any provision of this Agreement.

        (c)   <u>Trade Secrets</u>. The Employee recognizes and acknowledges that TQL's trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information as they may exist from time to time are valuable, special, and unique assets of TQL's business, access to and knowledge of which are essential to performance of Employee's duties hereunder. Employee will not hereafter disclose such trade secrets, Customer lists, Motor Carrier lists, Load Management System, private processes, and other Confidential Information to any person, firm, corporation, association, or other entity for any reason or purpose whatsoever, nor shall Employee make use of any such property for Employee's own purpose or the benefit of any person, firm, corporation, association, or any entity other than TQL under any circumstance.

        (d)   <u>Reasonableness of Restrictions</u>.   Employee recognizes that the foregoing geographic, duration, and content restrictions are reasonable and properly required for the adequate protection of the business of TQL from the disclosure of Confidential Information and unfair competition.

        (e)   <u>Injunction</u>. If there is a breach or threatened breach of any part of this Agreement, TQL shall be entitled to an injunction restraining Employee from such breach or threatened breach. Alternatively and additionally, TQL, in its sole discretion, may pursue a claim for damages in tort and/or contract resulting from any breach or threatened breach of this Agreement by Employee. If Employee is found by a court of competent jurisdiction to have violated the terms of this Agreement, Employee shall be liable for costs, expenses, and reasonable attorneys' fees incurred by TQL.

        (f)   For purposes of this Agreement, the term: (i) "Customer" is any individual, business, or other entity, for whom TQL has rendered any service, or with respect to which TQL has planned and/or made contact for the purpose of rendering any service, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (ii) the term "Motor Carrier" is any over-the-road shipper, carrier, trucker, or hauling business that has transported freight for any TQL Customer as a result of a relationship, dealings, arrangements, or communications with TQL, or with respect to which TQL has planned and/or made contact for this purpose, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (iii) the term "Competing Business" is any person,

Initials AJ

firm, corporation, or entity that is engaged in shipping, third-party logistics, freight brokerage, truck brokerage, or supply-chain management services anywhere in the Continental United States; and (iv) the term "solicit" includes but is not limited to, any efforts in any form, intended to take business away from, intercept or interfere with the business of TQL, including relationships with TQL and its employees, Customers, Motor Carriers, clients, consultants, suppliers, vendors, lessees, lessors, and employees, and specifically, including doing business with any Customer or Motor Carrier.

10.    <u>Governing Law and Jurisdiction</u>.  This Agreement shall be interpreted and enforced under the laws of the State of Ohio, and any action, suit or proceeding with respect to or arising out of this Agreement shall be brought in the Court of Common Pleas, Clermont County, Ohio, Court of Common Pleas, Hamilton County, Ohio, or United States District Court for the Southern District of Ohio.

11.    <u>Severability</u>. Should any of the provisions of this Agreement be declared or determined to be illegal or invalid, (a) the validity of the remaining parts, terms or provisions shall not be affected thereby and said illegal or invalid part, term, or provision shall be deemed not a part of this Agreement; (b) the remaining provisions of this Agreement shall remain in full force an effect and shall not be affected by such illegal, invalid, or unenforceable provision or by its severance from this Agreement; and (c) there shall be added automatically as a part of this Agreement a provisions as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and still be legal, valid, and enforceable.

12.    <u>Personnel Policies</u>.  Employee agrees to abide by TQL's rules, regulations, policies and practices, written and to the extent that Employee has actual knowledge thereof, unwritten, as they may from time to time be adopted or modified by TQL at its sole discretion. TQL's written rules, policies, practices and procedures shall be binding on Employee unless superseded by or in conflict with this Agreement, in which case this Agreement shall govern. However, such rules, policies, practices and procedures are not part of this Agreement and whether written, oral or implied, shall not create any contract between Employee and TQL at any time. Additional contractual obligations or other modifications of this agreement may be made only by an express written agreement between Employee and TQL.

13.    <u>No Conflicting Employee Agreement</u>.    Employee represents that Employee is not bound by any agreement or contract or other duty to a former employer or any other party which would prevent Employee from complying with any obligations hereunder or performing his or her duties as an employee of TQL.

14.    <u>Acknowledgments</u>. Employee acknowledges and agrees that he or she:

(a) has had sufficient time within which to consider the Agreement before executing it;

(b) has carefully read and fully understands all of the provisions of the Agreement;

Initials AJ

(c) knowingly and voluntarily agrees to all of the terms set forth in the Agreement;

(d) knowingly and voluntarily intends to be legally bound by this Agreement;

(e) has had sufficient opportunity to obtain and consult with his or her own lawyer regarding this Agreement; and

(f) has knowingly and voluntarily executed this Agreement.

15.   Binding Agreement.   This Agreement shall be binding and enforceable upon the parties hereto, their heirs, representatives, successors, and assigns. The Agreement is not assignable by Employee.

16.   Entire Agreement. This Agreement sets forth the entire agreement between the parties hereto pertaining to the subject of this Agreement, and fully supersedes in all respects any and all prior oral or written agreements or understandings between the parties hereto pertaining to the subject of this Agreement, including, but not limited to, the prior non-compete. This Agreement may be amended or modified only upon written agreement signed by both of the Parties hereto. This Agreement may be executed in Counterparts, each of which shall be deemed an original and all of which taken together shall constitute one Agreement.

In Witness Whereof, the undersigned parties to this Agreement have duly executed it on the day and year first written below.

EMPLOYEE:                                    TOTAL QUALITY LOGISTICS, LLC

_____                  By: _____
         Signature                           
Name: _Aaron Jacobs_                         Name: _Ralph O Lee_
         Please Print                        
Address: _4861 Muirwoods Ct._                Title: _VP of HR_

_Cincinnati, OH  45242_                       Date: _5/28/13_

_____

Date: _05/28/2013_

7                                            Initials _AJ_

## TOTAL QUALITY LOGISTICS, LLC

## CONFIDENTIALITY AGREEMENT AND RESTRICTIVE COVENANT

### Florida

THIS CONFIDENTIALITY AGREEMENT AND RESTRICTIVE COVENANT ("the Agreement"), is made and entered into on _February 2ᵗʰ_ , 201_5_, by and between TOTAL QUALITY LOGISTICS, LLC ("TQL" or "the Company") and _Michael Cherenuk_ ("the Employee").

### RECITALS:

**WHEREAS,** the Company is an Ohio Limited Liability Company that operates in the State of Florida. The Company is engaged in providing shipping services, third-party logistic services, freight brokerage services, truck brokerage services, and supply-chain management services throughout the Continental United States. References to TQL in this Agreement refer to TQL, its parent and subsidiary corporations, all related entities, and its successors and assigns;

**WHEREAS,** The Company is unique within the organizations providing shipping services, third-party logistic services, freight brokerage services, truck brokerage services, and supply-chain management services (the "Industry"). The Company has spent extensive time developing relationships with Customers, Carriers, suppliers and others within the Industry. TQL provides extensive training on ways to succeed within the Industry. TQL also provides tools, such as proprietary software, that are unique within the Industry. The relationships, tools, and training developed by TQL will assist Employee in gaining intimate knowledge of TQL's business model, its Customers, Carriers, suppliers, contact information, lanes, pricing, sales strategy, service and other confidential and proprietary information. The knowledge learned at TQL is unlike what could be learned elsewhere within the Industry. TQL takes steps to protect the confidentiality of this information and it would have value to a TQL competitor. Employee, therefore, acknowledges and agrees that what Employee learns at and is trained in at TQL would necessarily cause unfair competition if Employee took employment competitive to TQL;

**WHEREAS,** TQL develops and maintains confidential, proprietary information (hereinafter referred to as "Confidential Information"), as defined in this Agreement;

**WHEREAS,** Employee agrees that any and all such Confidential Information set forth above, whether or not formally designated as such, is vital to the success of TQL's business and Employee understands that all such Confidential Information is the exclusive property of TQL, that it is to be treated and maintained as confidential proprietary information by Employee, and that it is treated and maintained as confidential, proprietary information by TQL;

**WHEREAS,** in order to allow TQL to remain effective and competitive in the marketplace in which it conducts its business, and to maintain its business relationships

FL            1

EXHIBIT C

on the basis of trust and confidence, it is essential that all Confidential Information remain protected from unauthorized disclosure, dissemination, and use, except as authorized and required by TQL to enable Employee to properly perform his or her work in the normal course of TQL's business;

**WHEREAS,** Employee acknowledges that unauthorized use or disclosure of Confidential Information as defined herein would cause, or be likely to cause, substantial and irreparable harm and detriment to TQL and would constitute unreasonable and unfair competition to TQL;

**WHEREAS,** Employee acknowledges that TQL's Customer and Carrier lists, other information about TQL's Customers and Carriers, its Load Management System, and other Confidential Information, are proprietary trade secrets with significant economic value, are compiled through a substantial investment of time and money by TQL, and are not common knowledge throughout the shipping, third-party logistics, freight brokerage, truck brokerage, and supply-chain management services industry;

**WHEREAS,** in the course and scope of employment by TQL, Employee must be given access to such Confidential Information from time-to-time or continuously, in order to effectively perform his or her job duties;

**WHEREAS,** TQL will not agree to employ or continue to employ Employee, unless Employee signs this Agreement and is bound by it;

**WHEREAS,** the Company has a strong and legitimate business interest in preserving and protecting its investments including, but not limited to, its specialized training, its Confidential Information, its trade secrets and its good will; and

**WHEREAS,** the Company desires to preserve and protect its legitimate business interests and Confidential Information further by prohibiting competitive activities of the Employee during his or her employment with the Company and by preventing unfair and unlawful competitive activities by Employee following termination of his or her employment with the Company.

**NOW THEREFORE,** in consideration of the employment or continued employment by the Company of the Employee and other good and valuable consideration the receipt and sufficiency of which is acknowledged by the Employee, the Company and the Employee agree:

1. <u>Recitals</u>. The "Recitals" set forth above are hereby restated and incorporated herein by reference as though fully set forth herein.

2. <u>Employment</u>. Employer employs Employee as an employee at will, and nothing in this Agreement changes Employee's status as an at-will employee. Either TQL or Employee may terminate Employee's employment for any reason at any time. Employee agrees to undertake and assume the responsibility for performing for and on behalf of TQL whatever duties shall be assigned to Employee by TQL at any time from

FL                                    2

time to time. It is further understood that TQL retains the right to modify Employee's duties at any time and, in its discretion, determine Employee's compensation, including, but not limited to, any salary, other cash compensation and benefits.

3.    Confidential Information – Defined.    The Employee recognizes, acknowledges and agrees that TQL develops and maintains confidential, proprietary information (referred to herein as "Confidential Information"), including but not limited to, its operating policies and procedures; computer data bases; computer software; methods of computer software development and utilization; computer source codes; financial records, including but not limited to, credit history and information about Customers and potential Customers, Carriers, and suppliers; information about transactions, pricing, the manner and mode of doing business, and the terms of business dealings and relationships with Customers and Carriers, financial and operating controls and procedures; contracts and agreements of all kinds, including those with Customers, Carriers, and vendors; pricing, marketing and sales lists and strategies; Customer lists and Carrier lists including contact names, addresses, telephone numbers, and other information about them; trade secrets; correspondence; accounts; business policies; purchasing information; functions and records; logistics management; and data, processes, and procedures.    Confidential Information also includes any information described above which TQL obtains from another company and which TQL treats as proprietary or designates as Confidential Information, whether or not owned or developed by TQL.    This information may be in tangible written form, computer databases, or it may be represented and communicated solely by oral expressions or business activities which are not reduced to written form. Confidential Information includes all information developed, acquired and maintained by Employee in the course of his or her employment with the Company as it may exist from time to time, and whether or not it is maintained on the Employee's personal computer, laptop, or other equipment personally owned by the Employee, and is the property of the Company. Further, Confidential Information may be protected by patents, copyrights, or other means of protection; and further includes, without limitation:

(a)    All documents describing, and all information and knowledge regarding, procedures or methods employed by the Company in soliciting, procuring, and handling the Company's customers and business, including working and billing procedures;

(b)    All information acquired by the Company relating to prospective and current business transactions and arrangements;

(c)    All market analyses and/or demographic market analyses and/or demographic information or studies of the current and/or potential markets of interest to the Company;

(d)    All understandings between or among the Company and other persons;

FL                                    3

(e)     All documents provided to the Company in confidence by third parties;

(f)     All legal documents and correspondence concerning the Company;

(g)     All opinions, decisions, rulings, and audits of governmental agencies relating to the Company;

(h)     All files concerning the Company's customers and prospective customers, and the contents of such files; and

(i)     All other information specifically designated "Confidential" by the Company.

4.     <u>Confidential Information – Admissions and Agreements</u>.  The Employee admits and agrees that such Confidential Information is a valuable, special and unique asset of the Company's business that gives the Company advantage over its actual and potential competitors, and the Employee further admits and agrees that:

(a)     The Company has implemented such practices and measures as are reasonably necessary to preserve and to protect the confidentiality of such Confidential Information;

(b)     The Employee has access to such Confidential Information;

(c)     The Employee has been instructed about, and knows and understands the value and importance of such Confidential Information;

(d)     The Employee, by reason of the trust relationship arising between the Company and him or her, owes the Company a fiduciary duty to preserve and protect such Confidential Information from all unauthorized disclosure or unauthorized use;

(e)     Such Confidential Information constitutes "trade secrets";

(f)     Unauthorized disclosure or unauthorized use of such Confidential Information would irreparably injure the Company;

(g)     The Employee agrees to immediately assemble, produce and return all of the Company's Confidential Information in the Employee's possession at any time during the course of his or her employment with the Company upon the request or demand of the Company; and

(h)     The Employee agrees to return all of the Company's Confidential Information and to delete the Company's Confidential Information from any personal computer (or similar device) of Employee upon the termination of Employee's employment with the Company. The Employee further consents to permit the Company

to inspect and delete all of the Company's Confidential Information from the Employee's personal computers, laptops and other equipment including any personal computer maintained by the Employee at his or her home or elsewhere. Upon Company's request, the Employee agrees to execute a written statement under oath swearing that all of the Confidential Information of the Company that the Employee previously maintained upon his or her personal computer, if any, has been deleted. The Employee further agrees that the Company shall have no obligation to pay any further compensation or remuneration to the Employee unless and until such time as the Employee provides his or her written statement under oath as contemplated by this Paragraph.

5.    <u>Confidential Information – Prohibited Acts</u>.   The Employee understands and agrees that all Confidential Information is to be preserved and protected, is not to be disclosed or made available, directly or indirectly, to third persons for purposes unrelated to the business objectives of the Company without prior written authorization of an executive officer of the Company, and is not to be used, directly or indirectly, for purposes unrelated to the business objectives of the Company without prior written authorization of an executive officer of the Company; specifically, and without modifying or limiting the Agreement, the Employee understands and agrees that, except in the ordinary course of conducting business for the Company, no Confidential Information, nor any part of it, either in original form or in duplicating or copied form, is to be (i) removed at any time from the premises of the Company, or (ii) disclosed or made available, verbally, by electronic transmission, or by any other form or manner of communication, to any person, firm, corporation, association, or any other legal entity for any reason or purposes whatsoever, without prior written authorization of an executive officer of the Company.

Employee agrees that Employee's engaging in any form of employment relationship with a Competing Business, as defined herein would necessarily result in Employee revealing, basing judgments and decisions upon, or otherwise using TQL's Confidential Information to unfairly compete with TQL.

For purposes of this Agreement, the term: (i) "Customer" is any individual, business, or other entity, for whom TQL has rendered any service, or with respect to which TQL has planned and/or made contact for the purpose of rendering any service, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (ii) the term "Carrier" is any over-the-road shipper, motor carrier, trucker, or hauling business or otherwise defined in 49 USC §13102(3) that has transported freight for any TQL Customer as a result of a relationship, dealings, arrangements, or communications with TQL, or with respect to which TQL has planned and/or made contact for this purpose, within the twenty-four (24) months immediately preceding the termination or cessation of Employee's employment; (iii) the term "Competing Business" is any person, firm, corporation, or entity that is engaged in third-party logistics, freight brokerage, truck brokerage, or supply-chain management services anywhere in the Continental United States; and (iv) the term "solicit" includes but is not limited to, any efforts in any form, intended to take business away from, intercept or interfere with the business of TQL, including relationships with TQL and its

FL                                                    5

employees, Customers, Carriers, clients, consultants, suppliers, vendors, lessees, lessors, and employees, and specifically, including doing business with any Customer or Carrier.

6. **Confidential Information – Continuing Obligations**. The Employee understands and agrees that his obligations under this Agreement, specifically including the obligations to preserve and protect and not to disclose (or make available) to third parties consistent with applicable law, continue indefinitely and do not, under any circumstances or for any reason, whether voluntarily or involuntarily, specifically including wrongful discharge, cease upon termination of employment; and that, in the event of termination of the Employee's employment for any reason, specifically including wrongful discharge, such Confidential Information shall remain the sole property of the Company and shall be left in its entirety in the undisputed possession and control of the Company after such termination. Employee agrees to inform all prospective or future employers of the Employee's obligations under the provisions of this Agreement.

7. **Confidential Information – Proprietary Interest**. The Employee understands and agrees that all such Confidential Information is and shall remain, at all times, the sole property of the Company; that he or she obtains no proprietary interest in any Confidential Information developed or acquired in the course of his employment with the Company; and that it shall be no defense to an action brought to enforce the confidentiality provisions of this Agreement that the Employee developed or acquired, in whole or in part, the Confidential Information disclosed or used without authorization.

8. **Confidential Information – Protected Whether Information of Parent or Subsidiaries**. That Employee recognizes, acknowledges, and agrees that this Agreement is specifically and expressly intended to protect, and does specifically and expressly protect all Confidential Information of the Company, whether in the possession, custody or control of the Company, its employees, officers, agents or any other affiliated, parent or subsidiary company.

9. **Restrictive Covenant**. During employment with the Company, and for a period of one (1) year immediately following termination of his employment, whether voluntarily or involuntarily, by wrongful discharge or for any other reason whatsoever, the Employee shall not (directly or indirectly, either as an individual on his own account or as a partner, joint venturer, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise) contact, solicit or accept business from, render any services, give assistance to or accept any compensation from any Customer or customer prospect of the Company. A customer prospect is any business, company, individual, partnership or entity, including former Customers, with which the Company or any of its employees, including but not limited to the Employee, had contact for the purpose of soliciting business, developing a business relationship, or discussing existing or potential services of the Company within the twelve (12) months immediately preceding the Employee's termination or cessation of employment.

FL                                    6

Further, Employee hereby agrees that he or she shall not, directly or indirectly, enter into, participate in, consult with, or engage in, any business in competition with the business of the Company, or with any Competing Business, as it now exists or may exist in the future, either as an individual or on his own account, or as a partner, joint venturer, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise, for a period of one (1) year after the date of the termination of Employee's employment with the Company.

This Agreement on the part of the Employee, is given and made by the Employee to induce the Company to employ or continue to employ the Employee for a position of trust and confidence and to enter into this Agreement with the Employee, and the Employee hereby acknowledges the sufficiency of the consideration of this Restrictive Covenant.

It is further understood and agreed that the running of the one (1) year set forth in this Paragraph shall be tolled during any time period during which Employee violates any provision of this Agreement.

This Restrictive Covenant shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action of the Employee against the Company, whether predicated upon this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of this Restrictive Covenant.

The refusal or failure of the Company to enforce this Restrictive Covenant against any other employee or ex-employee, for any reason, shall not constitute a defense to the enforcement by the Company of this Restrictive Covenant, nor shall it give rise to any claim or cause of action by such employee or ex-employee against the Company.

If any portion of this Restrictive Covenant is held by a Court of competent jurisdiction to be unreasonable, arbitrary, against public policy for any reason, or invalid for any reason, the Restrictive Covenant shall be considered divisible, as to time, to geographical area, and to restrictive scope; each month of the specified period shall be deemed a separate period, each square mile within the restricted territory shall be deemed a separate geographical area, and each customer and customer prospect shall be deemed a separate area of restriction so that the lesser period or area of restriction shall remain effective so long as such lesser restriction is not unreasonable, arbitrary, or against public policy for any reason. The Company and the Employee agree that, if a Court of competent jurisdiction should determine the specified period or the scope of the restriction to be unreasonable, arbitrary or against public policy for any reason, a lesser period or restrictive scope that is determined to be reasonable non-arbitrary, and not against public policy for any reason, may be enforced by the Company against the Employee.

10.  Confidential Information – Remedies.  If an action should have to be brought by the Company against the Employee to enforce the provisions of this

FL                                    7

Agreement, the Employee recognizes, acknowledges and agrees that the Company is entitled to all civil remedies including without limitation:

(a) Preliminary and permanent injunctive relief restraining the Employee from any unauthorized disclosure or use of any Confidential Information, in whole or in part, and from rendering any service to any person, firm, corporation, association, or other legal entity to whom or to which such Confidential Information, in whole or in part, has been disclosed or is threatened to be disclosed; and

(b) Actual damages, attorneys' fees in the trial and appellate courts, costs and expenses of investigation and litigation, including expert witness fees and other costs and expenses; and all other remedies available under law.

Nothing in this Agreement shall be construed as prohibiting the Company from pursuing any other legal or equitable remedies available for breach or threatened breach of the provisions of this Agreement, and the existence of any claim or cause of action of the Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of any of the provisions of this Agreement.

11. <u>Restrictive Covenant – Remedies</u>. The Company and the Employee agree that, in the event of a breach by the Employee of the Restrictive Covenant set forth above, such a breach would irreparably injure the Company and would leave the Company with no adequate remedy at law, and the Company and the Employee further agree that, if an action should have to be brought by the Company against the Employee to enforce the Restrictive Covenant, the Company shall be entitled to all available civil remedies under Ohio and/or Florida statutes and case law. The remedies available to Employer against Employee shall further include, without limitation:

(a) Preliminary and permanent injunctive relief restraining the Employee from violating, directly or indirectly, either as an individual, on his own account or as a partner, joint venturer, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise, the competitive restriction of Paragraph 9 above; and

(b) Actual damages, attorneys' fees in the trial, appellate courts; costs and expenses of investigation and litigation, including expert witness fees and other costs and expenses, and all other remedies available under law.

Nothing in this Agreement shall be construed as prohibiting the Company from pursing any other legal or equitable remedies available to it for breach or threatened breach of the Restrictive Covenant, and the existence of any claim or cause of action of the Employee against the Company, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company of the Restrictive Covenant.

FL                                                8

Should an action have to be brought by the Company against the Employee to enforce the Restrictive Covenant, the period of restriction shall be deemed to begin running on the date of entry of an Order granting the Company preliminary injunctive relief, and shall continue uninterrupted for the next succeeding one (1) year; the Employee acknowledges and agrees that the intent and purpose of the Restrictive Covenant is to preclude him or her from competing with the Company for a full one (1) year period, and that such purpose and effect would be frustrated by measuring the period of restriction from the date of termination of employment where the Employee failed to honor the Restrictive Covenant, until directed to do so by Court Order.

12.   <u>Property Rights and Assignment</u>.   Employee agrees that any work, invention, product design, or technological innovation created, conceived, developed, produced, generated, and/or improved by Employee, whether or not patentable, or subject to copyright, trademark, or trade secret protection, at any time during or arising out of Employee's employment with TQL that results from, is suggested by, or relates to any work which Employee does for TQL, shall be the absolute property of TQL and shall promptly be disclosed by Employee to TQL. Employee hereby assigns any and all right, title, and interest in any work product to TQL, including assigning any and all rights to any future invention arising out of or relating to Employee's employment with TQL. To the extent necessary, during employment and thereafter, Employee shall sign applications, assignments, and any other papers that TQL may consider necessary or helpful in perfecting and enforcing TQL's rights in, and to, any such invention, improvement, and/or technological innovation.

13.   <u>Consideration</u>.   The Employee expressly acknowledges and agrees that the execution by the Company of this Agreement and the obligations of the Company under this Agreement constitute full, adequate, and sufficient consideration to the Employee from the Company for the duties, obligations, and covenants of the Employee under this Agreement, including, by way of illustration and not by way of limitation, the agreements, covenants, and obligations of the Employee under Paragraphs 4, 5, 6, 7, 8, 9 and 12 of this Agreement.   The Company expressly acknowledges and agrees similarly with respect to the consideration received by it from the Employee under this Agreement.

14.   <u>Personnel Policies</u>.    Employee agrees to abide by TQL's rules, regulations, policies and practices, written and to the extent that Employee has actual knowledge thereof, unwritten, as they may from time to time be adopted or modified by TQL at its sole discretion.  TQL's written rules, policies, practices and procedures shall be binding on Employee unless superseded by or in conflict with this Agreement, in which case this Agreement shall govern.  However, such rules, policies, practices and procedures are not part of this Agreement and whether written, oral or implied, shall not create any contract between Employee and TQL at any time.  Additional contractual obligations or other modifications of this agreement may be made only by an express written agreement between Employee and TQL.

15.   <u>Notices</u>.   Any and all notices that shall be given pursuant to this Agreement shall be in writing, shall be either actually delivered or sent by United States

FL                                        9

mail, return receipt requested, and shall be addressed to the parties at the addresses shown on the signature page of this Agreement.

16. <u>Consent to Jurisdiction and Venue – Waiver of Jury Trial</u>. The Employee hereby consents to jurisdiction and venue for any action brought by the Company arising out of a breach or threatened breach of this Agreement shall be brought in the Court of Common Pleas, Clermont County, Ohio or the United States District Court located in the jurisdiction where the office of your employment is located, and the Employee hereby agrees that any controversy which may arise under this Agreement or the relationship established by this Agreement would involve complicated and difficult factual and legal issues and that, therefore, any action brought by the Company against the Employee or brought by the Employee, alone or in combination with others, against the Company, whether arising out of this Employment Agreement or otherwise, shall be determined by a judge sitting without a jury.

17. <u>Acknowledgment</u>. The Employee hereby acknowledges that he or she has been provided with a copy of this Agreement for review prior to signing it, that he or she has been given the opportunity to have this Agreement reviewed by his or her own attorney prior to signing it, that he or she understands the purposes and effects of this Agreement, and that he or she has been given a signed copy of this Agreement for his or her own records.

18. <u>Waiver of Breach</u>. The waiver by the Company of a breach or threatened breach of any provision of this Agreement by the Employee shall not be construed as a waiver of any subsequent breach of the Employee.

19. <u>Assignability</u>. This Agreement shall be binding upon and inure to the benefit of Employer, its successors, and assigns, and shall be binding upon and inure to the benefit of Employee, his/her personal representatives, estate, heirs, and designated beneficiaries.

20. <u>Rules of Construction</u>.

(a) <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Company and the Employee pertaining to the subject matters hereof, and it supersedes all negotiations, preliminary agreements, and all prior and contemporaneous discussions and understandings of the parties in connection with the subject matters hereof. Except as otherwise provided, no covenant, representation, or condition not expressed in either this Agreement or an amendment hereto made and executed in accordance with the provisions of Subparagraph (b) of this paragraph shall be binding upon the parties hereto or shall affect or be effective to interpret, change, restrict or terminate the provisions of this Agreement;

(b) <u>Amendments</u>. No change, modification, or termination of any of the terms, provisions or conditions of this Agreement shall be effective unless made in writing and signed or initialed by all parties to this Agreement;

FL                                                          10

(c)     Governing Law.  This Agreement shall be governed and construed in accordance with the statutory and decisional law of the State of Ohio first, and Florida law if necessary;

(d)     Severability.  If any paragraph, subparagraph or provision of this Agreement, or the application of such paragraph, subparagraph or provision is held invalid, the remainder of the agreement, and the application of such paragraph, subparagraph, or provision to persons or circumstances other than those with respect to which it is held invalid, shall not be affected thereby;

(e)     Headings and Captions.  The titles and captions of paragraphs and subparagraphs contained in this Agreement are provided for convenience or reference only, and they shall not be considered a part of this Agreement; such titles or captions are not intended to define, limit, extend, explain, or describe the scope or extent of this Agreement or any of its terms, provisions, representations, warranties, conditions, etc., in any manner or in any way whatsoever.

(f)     Gender and Number.  All pronouns shall be deemed to refer to the masculine or feminine, and to the singular or plural, as the identity of the person or persons may require; and

(g)     Continuance of Agreement.  The rights, responsibilities and duties of the Company and the Employee, and the covenants and agreements contained in this Agreement shall survive the execution of this Agreement, shall continue to bind the parties to this Agreement, shall continue in full force and effect until each and every obligation of the parties pursuant to this Agreement shall have been performed, and shall be binding upon the successors and assigns of the parties.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above-written.

WITNESSES:

_____

Benjamin Friend
_____


_____

Bryan Tyson
_____

TOTAL QUALITY LOGISTICS, LLC
"Company"

By: _____
Print: Bryan Tyson
Address: 604 Courtland St. Ste 250
Orlando, FL 32804

"Employee"

_____

Print: Michael Gherxeniwet
Address: 3201 Florene dr
Orlando FL 3280 ,

FL                          11