**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Total Quality Logistics, LLC, | : | Case No. 1:16-cv-00335 |
| Plaintiff, | : | Judge Michael R. Barrett |
| v. | : | |
| Aptive System, Inc. d/b/a Transfix, Inc., et al. | : | |
| Defendants. | : | |

## OPINION AND ORDER

This matter is before the Court upon Defendants' Motion to Dismiss and for Sanctions. (Doc. 34). Plaintiff filed a Response in Opposition (Doc. 38) and Defendant filed a Reply (Doc. 41).

### I. Background

Plaintiff Total Quality Logistics ("TQL") is a freight brokerage and third-party logistics provider with a nationwide customer base. (Doc. 15, ¶¶ 8-10). Defendant Aptive System, Inc., doing business as Transfix, Inc. ("Transfix"), is also a third-party logistics broker. (Doc. 17, ¶ 12). According to the Complaint, Transfix is a direct competitor of TQL. (Doc. 15, ¶¶ 12, 28). Defendants Spinola, Jacobs, and Ghebrehiwet are former TQL employees who subsequently went to work at Transfix. (Doc. 15, ¶¶ 1-4); (Doc. 17, ¶ 4). TQL asserts that Defendant Spinola worked at TQL from September 2014 to June 2015; Defendant Jacobs worked at TQL from May 2013 to November 2015; and Defendant Ghebrehiwet worked at TQL from February 2015 to December 2015. (Doc. 15, ¶¶ 1-3,

11, 26). TQL asserts that, after each Defendant left TQL, they began working for Transfix in similar, entry-level, positions. *See* (*Id.*, ¶ 27, 31).

The individual Defendants executed Employee Non-Compete, Confidentiality and Non-Solicitation Agreements ("Agreements") as a condition of their employment with TQL. (Doc. 15, PageID 299-309 (Spinola), 310-16 (Jacobs), 317-27 (Ghebrehiwet)). The Agreements specified, inter alia, that Defendants would maintain the secrecy of TQL's confidential information, would not engage in any competing business for a period of one year following cessation of employment with TQL, would not solicit customers or divert business from TQL, and would not employ, recruit, or solicit any person who is, or within the previous twelve months has been, an employee of, consultant with, or been party to another business relationship with TQL. (*Id.*, PageID 299-327).

After TQL hired the individual Defendants, TQL provided each of them with a training period. (Doc. 15, ¶ 16). Although TQL asserts that, on average, it takes the company 18 weeks to train a new employee, TQL does not state how long it trained the individual Defendants. *See* (Doc. 15).

TQL filed its initial Complaint in this matter in state court, Defendants removed the case in February 2016 (Doc. 1), and TQL filed an Amended Complaint in April 2016 (Doc. 15). TQL brings claims of breach of contract, breach of fiduciary duty, misappropriation of trade secrets, and intentional interference with contract and unfair competition and requests compensatory damages, punitive damages, preliminary and permanent injunctive relief, fees and costs. (Docs. 4, 15).

Defendants served its first set of discovery requests requesting identification of the specific trade secrets that TQL alleges were misappropriated and the production of

documents related to those specific trade secrets. (Doc. 35, Ex. A) ("Interrogatory No. 5 sought the identification of 'all of TQL's trade secrets, proprietary information and confidential information that you claim [Defendants] have in their possession, has used, or is likely using to compete against TQL'".). On March 26 2016, TQL responded to Interrogatory Number 5 with:

> ANSWER: Objection. TQL objects to this Interrogatory on the grounds that it is premature, and seeks information that is alleged to be in Defendants' position, thus making Defendants the best parties to answer this Interrogatory. Simply put, TQL is unaware of the trade secrets, proprietary and confidential information Spinola removed and/or disclosed to Transfix. Further objection, the information sought is, among other things, protected by Ohio's Uniform Trade Secrets Act, Ohio Revised Code § 1333.61 *et seq.* Subject to and without waiving its objections, TQL also entrusted Spinola with its confidential information and materials, including detailed expense information; detailed pricing, profitability, and margin information; non-public information about the individualized needs and requirements of particular customers; customer lists and specific contact information within those organizations that is not publicly known, such as cell phone numbers and email addresses; confidential information about routes and lanes used by particular carriers, including performance ratings, certifications, equipment, lanes, and products carried; profit and loss information; business procedures and operating methods; TQL's specialized software programs; and TQL's marketing and business strategies. While at TQL, Spinola developed contacts with and significant knowledge of customers, carriers, and other persons doing business with TQL. Spinola also became intimately familiar with TQL's client relationships, pricing, marketing, training, sales lists, customers lists, motor carriers lists, business methods and strategies, commission and fee rates, sales figures, and strategic business forecasts and plans, including marketing strategies and targets.

*Id.* TQL produced 78 documents that consisted of pleadings already served in the case, some personnel documents of the individual Defendants, and two pages that appear to contain TQL customer information but were not identified as trade secrets or responsive to any particular discovery request. *See id.*

On March 30, 2016, Defendants sent TQL a deficiency letter to TQL stating that they are entitled to discovery related to the specific trade secrets alleged to be at issue

3

and that TQL's failure to identify any specific trade secret or produce the documents alleged to have been misappropriated by Defendants is evasive. *Id.* On April 11, 2016, after not receiving a substantive response from TQL, Defendant requested an informal telephone discovery conference with the Court. (Doc. 35, Ex. B).

The Court held a telephone discovery conference and follow up telephone conference on April 14, 2016 and April 26, 2016. On April 19, 2016, the Court approved the parties' stipulated Protective Order. (Doc. 14).

On May 18, 2016, TQL supplemented its prior production by providing Defendants an Excel spreadsheet that, according to Defendants, appears to contain information associated with various customers that Defendant Spinola viewed during his employment at TQL but was not bates-stamped or accompanied by any information to determine the purposes for which it was provided to Defendants. (Doc. 34, PageID 390).

The Court held a follow up telephone conference on May 19, 2016.

On August 8, 2016, Defendants sent a second deficiency letter to TQL stating that, "[m]ost notably missing is TQL's identification, with specificity, of the trade secrets at issue in this case" and that, at the conferences with the Court, the parties "agreed that TQL would provide a 'screen shot' of its system in order for Transfix to determine what kinds of information Spinola would have had access to when he 'viewed' each customer on TQL's software," but TQL had not produced that screen shot. (Doc. 34, Ex. C). On August 21, 2016, TQL provided Defendants a document that purported to be the requested screen shot, but it was illegible. (*Id.*, Ex. D). Defendants requested a legible copy, and, on September 14, 2016, TQL provided another illegible copy. (*Id.*, Ex. E).

Defendants renewed their request for a legible copy of the screen shot and served a second set of discovery requests requesting identification of the specific trade secrets and the production of documents related to the specific trade secrets. On September 26, 2016, TQL responded with objections and did not provide any additional information or documents. (*Id.*, Ex. F) (Objecting, inter alia, "this Interrogatory seeks information already in the possession of Defendants since they were the individuals who misappropriated TQL's trade secrets.").

Defendants sent a third deficiency letter on October 31, 2016. (*Id.*, Ex. G). TQL did not reply to this letter.

As of November 2016, Defendant Jacobs no longer worked for Transfix and, as of February 2017, Defendant Spinola no longer worked for Transfix. (Docs. 25, 27).

On March 1, 2017, Defendants requested another informal telephone discovery conference with the Court, stating that they had not received a legible copy of the screen shot and TQL continued to fail to specifically identify the trade secrets at issue. (Doc. 35, Ex. H). TQL provided a legible copy of the screen shot on March 15, 2017. (*Id.*, Ex. I). In response, Defendants stated that the screen shot did not specifically identify the trade secrets at issue and sent a third set of discovery requests that asked whether the legible screen shot contained all of the trade secrets at issue and, if not, to specifically identify any others. (*Id.*, Ex. J). TQL responded on May 2, 2017, with objections and did not provide any additional information or documents. (*Id.*, Ex. K) (Objecting, inter alia, "TQL states that it has a number of trade secrets and proprietary/confidential information and it does not keep a running list of all of them and therefore does not have an exclusive list.").

Defendant sent a fourth deficiency letter on May 12, 2017. (*Id.*, Ex. L). TQL responded, in a June 9, 2017 letter, that the screen shot was of TQL's Load Manager program which provided Defendant Ghebrehiwet "access to most, if not all, of the customer and carrier-related TQL trade secret information" and that "[w]ithout more specificity as to what you seek, TQL is unable to provide any more documents." (*Id.*, Ex. M). Defendants responded in June 19, 2017 letter stating that TQL must specifically identify the trade secrets at issue before discovery can proceed. (*Id.*, Ex. N).

The Court held a status conference on September 7, 2017 and ordered the parties to submit a summary of pending discovery deficiencies to the Court by September 19, 2017. Defendants submitted a timely summary arguing that TQL has refused to identify the alleged trade secrets or confidential information at issue in the 21 months since initiating this lawsuit and TQL has not provided additional discovery responses or documents to date. (*Id.*, Ex. O). After receiving Defendants' letter to the Court, that same day, TQL sent Defendants "a thumb drive containing multiple documents that we are producing which relate to TQL trade secrets. We are producing these documents as 'Attorneys' Eyes Only.' These documents are in response to your Request for Production of Documents and should more than address your deficiency letter." (*Id.*, Ex. P).

The thumb drive that TQL produced to Defendants contains 13,454 documents that are not bates-stamped. (Doc. 34, PageID 394).

On September 20, 2017, TQL informed the Court, via letter, that Transfix was deficient in its discovery responses. (Doc. 35, Ex. R).

Defendants sent a fourth deficiency letter on October 12, 2017. (Doc. 35, Ex. Q). Defendants asserted that the 13,454 non-bates-stamped documents, on an unlabeled

and unsecured thumb drive, were non-responsive and inappropriately designated as Attorneys' Eyes Only, and the production violated the Local Rules and Federal Civil Rules of Procedure. *Id.* TQL did not respond to Defendants request for dismissal or an immediate cure to the outstanding discovery deficiencies. That same day, Defendants submitted a letter to the Court responding in opposition to TQL's September 20, 2017 letter. (*Id.*, Ex. S).

The Court held a telephone conference on October 13, 2017, during which Defendants stated their intention to file a motion to dismiss. Defendants filed their Motion to Dismiss the following month and the parties completed briefing. The Court held oral argument.

Defendants argue that TQL's pleading and discovery responses fail to identify the specific trade secrets that these specific Defendants allegedly misappropriated and move to dismiss the matter for failure to prosecute. (Docs. 34, 41). TQL responds that it has articulated its trade secrets claim such that Defendants are on notice of the claims asserted against it. (Doc. 38).

II. **Legal Standard**

"If the plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." FED. R. CIV. P. 41(b). *Accord Schafer v. City of Defiance Police Dep't*, 529 F.3d 731, 736 (6th Cir. 2008) ("Rule 41(b) of the Federal Rules of Civil Procedure confers on district courts the authority to dismiss an action for failure of a plaintiff to prosecute the claim or to comply with the Rules or any order of the court.") (citing *Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 362-

63 (6th Cir. 1999)). Courts sitting in the Sixth Circuit consider four non-dispositive factors in evaluating dismissal under Fed. R. Civ. P. 41(b):

> (1) whether the party's failure is due to willfulness, bad faith, or fault; (2) whether the adversary was prejudiced by the dismissed party's conduct; (3) whether the dismissed party was warned that failure to cooperate could lead to dismissal; and (4) whether less drastic sanctions were imposed or considered before dismissal was ordered.

*Knoll*, 176 F.3d at 363; *see Stough v. Mayville Cmty. Sch.*, 138 F.3d 612, 615 (6th Cir.1998). Although none of the above factors alone is outcome dispositive, a court has properly dismissed a case where there is a "clear record of delay or contumacious conduct." *Knoll*, 176 F.3d at 363.

### III. <u>Analysis</u>

Each of TQL's claims are premised on the fact that, by working at Transfix in their positions, the individual Defendants are exposing, or exposed, TQL's confidential information and trade secrets in violation of their Agreements. *See e.g.,* (Doc. 15, ¶ 30) ("Based on their positions with Transfix, the Former TQL Employees have and it is inevitable that they will use and disclose TQL's confidential and trade secret information to Transfix.").

"An entity claiming trade secret status bears the burden of identifying and demonstrating that the information is protected . . . and . . . must demonstrate that it has actively sought to maintain that information's secrecy."[1] *84 Lumber Co., L.P. v. Houser*, 936 N.E.2d 131, 140 (11th Dist. 2010). "Only the [plaintiff] will know what portion of that

---

[1] The Court recognizes that some federal courts do not require a plaintiff to identify its alleged trade secrets before being allowed to conduct discovery. *A&P Tech., Inc. v. Lariviere*, No. 1:17-CV-534, 2017 WL 6606961, at *7 (S.D. Ohio Dec. 27, 2017). However, the Court emphasizes that "[t]he divergent rulings from various federal courts on the issue of whether to require prediscovery identification of trade secrets reinforces the idea that rulings on discovery limitations are a case-by-case decision where courts must use their broad discretion based heavily on the distinct circumstances of any particular action." *Id.* at *8.

myriad of information known to [plaintiff's] employees can legitimately be claimed as a trade secret," and "the burden is . . . not upon the defendant to guess at what they are." *A&P Tech., Inc.*, 2017 WL 6606961, at *7 (citing *Safety Today, Inc. v. Roy*, No. 2:12-CV-510, 2014 WL 12749231, at *2 (S.D. Ohio Feb. 11, 2014)). "A '[f]ailure to identify . . . trade secrets with sufficient specificity' renders courts 'powerless' to enforce them." *Id.* (citing *Porous Media Corp. v. Midland Brake, Inc.*, 187 F.R.D. 598, 600 (D. Minn. 1999)).

As a colleague in this District has explained:

> courts have identified at least four policies which support delaying trade secret discovery until the trade secret plaintiff has sufficiently described the trade secrets at issue. First, if discovery on the defendant's trade secrets were automatically permitted, lawsuits might regularly be filed as "fishing expeditions" to discover the trade secrets of a competitor. . . . Second, until the trade secret plaintiff has identified the secrets at issue with some specificity, there is no way to know whether the information sought is relevant. . . . [T]hus, requiring the plaintiff to sufficiently identify its trade secrets prior to allowing discovery on the defendant's trade secrets helps the court to determine the outer permissible bounds of discovery and prevents needless exposure of the defendant's trade secrets.
>
> Third, it is difficult, if not impossible, for the defendant to mount a defense until it has some indication of the trade secrets allegedly misappropriated. Often, a trade secret defendant will defend the claim by showing that it does not use the claimed secret or that the information is in fact not secret. Until the defendant knows what information is at issue, it cannot attempt to rebut the plaintiff's charges of misappropriation. Finally, requiring the plaintiff to state its claimed trade secrets prior to engaging in discovery ensures that it will not mold its cause of action around the discovery it receives.

*Id.* at *8-9 (citing *DeRubeis v. Witten Technologies, Inc.*, 244 F.R.D. 676, 680-81 (N.D. Ga. 2007) (citations omitted).

Twenty-one months elapsed between TQL's response to Defendants' first set of written discovery requests and when Defendants filed their Motion to Dismiss. In that time,

the following are the alleged trade secrets that TQL has identified as allegedly misappropriated by Defendants:

> confidential information and materials, including detailed expense information; detailed pricing, profitability, and margin information; non-public information about the individualized needs and requirements of particular customers; customer lists and specific contact information within those organizations that is not publicly known, such as cell phone numbers and email addresses; confidential information about routes and lanes used by particular carriers, including performance ratings, certifications, equipment, lanes, and products carried; profit and loss information; business procedures and operating methods; TQL's specialized software programs; and TQL's marketing and business strategies. While at TQL, Spinola developed contacts with and significant knowledge of customers, carriers, and other persons doing business with TQL. Spinola also became intimately familiar with TQL's client relationships, pricing, marketing, training, sales lists, customers lists, motor carriers lists, business methods and strategies, commission and fee rates, sales figures, and strategic business forecasts and plans, including marketing strategies and targets.

(Doc. 35, Ex. A). TQL has produced:

- two pages that appear to contain TQL customer information but were not identified as trade secrets or responsive to any particular discovery request. *See id.*

- one Excel spreadsheet that appears to contain information associated with various customers that just Defendant Spinola viewed during his employment at TQL but was not bates-stamped or accompanied by any information to determine the purposes for which it was provided to Defendants. (Doc. 34, PageID 390).

- a screen shot of TQL's Load Manager program that provided just Defendant Ghebrehiwet's "access to most, if not all, of the customer and carrier-related TQL trade secret information" (Doc. 35, Ex. M).

- the 13,454 documents produced For Attorneys Eyes Only. (Doc. 34, PageID 394). TQL states that these documents are "its entire training manual" and TQL produced it "since the training manual in many respects is TQL's playbook as to TQL's business strategies, business operations, and strategies and ways that TQL obtains customers and increases customer business." (Doc. 38-3). TQL does not state which individual Defendants had access to this manual.

After reviewing the distinct facts of this particular action, and after multiple telephone conferences and 21 months of time to do so, the Court finds that TQL has not

identified the specific trade secrets that these specific Defendants have allegedly misappropriated. The list that TQL produced in response to Defendants' first set of discovery requests "is not a list of actual trade secrets but rather a list of categories of business information that for the most part are in no way unique to [TQL]." *A&P Tech., Inc.*, 2017 WL 6606961, at *10. Further, "plaintiffs pursuing a threatened misappropriation theory . . . fail to state a 'cognizable' claim when they merely rely on 'generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets.'" *Id.* (quoting *Degussa Admixtures, Inc. v. Burnett*, 277 F. App'x. 530, 535 (6th Cir. 2008)). Moreover, to the extent that TQL believed the screen shot to be a trade secret, it has been publicly disclosed on the record since late 2017 and TQL has not objected to that disclosure or asserted protection under the Protective Order in place in this matter. (Doc. 35, Ex. I); *see Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 511 F. App'x 398, 409 (6th Cir. 2013) ("information that has been publicly disclosed ... is no longer eligible for trade–secret protection."). The two pages that appear to contain TQL customer information and the one spreadsheet were not identified as trade secrets. To the extent that TQL contends that its entire training manual constitutes the trade secrets at issue for these specific Defendants—and it is not entirely clear if that is TQL's contention—the Court is not convinced. *See e.g.*, *Safety Today, Inc.*, 2014 WL 12749231, at *3 (the plaintiff's "assertion that everything in the 3500 pages of documents it produced is a trade secret is simply not borne out by the documents themselves, or at least the portions which the Court has reviewed.").

Defendants are in no better position to answer the question of what trade secrets they supposedly took with them from TQL to Transfix and allegedly misappropriated at

and with Transfix. *See e.g.*, *id.* ("based on the record before the Court, [the plaintiff] has been both too vague and too inclusive, effectively asserting that all information in or about its [business] is a trade secret") (internal quotations omitted); *Kendall Holdings, Ltd. v. Eden Cryogenics, LLC*, No. 2:08-CV-390, 2011 WL 3652696, at *1 (S.D. Ohio Aug. 18, 2011).

After a review of the four *Knoll* factors and the specific facts of this case, the Court finds dismissal to be appropriate, but emphasizes that it comes to finding based on the distinct circumstances of this particular action and does not do so lightly.[2] *See Knoll*, 176 F.3d at 363. *Cf. Larkins v. Family Dollar Stores of Ohio, Inc.*, No. 1:07CV354, 2008 WL 3926409, at *2 (S.D. Ohio Aug. 26, 2008) ("the Court does not necessarily abuse its discretion by ordering dismissal as the first sanction for dilatory and contumacious conduct") (citing *Harmon v. CSX Transportation, Inc.*, 110 F.3d 364, 367 (6th Cir. 1997)).

Finally, the Court declines to impose monetary sanctions on either party. *Compare* (Doc. 34, PageID 403), *with* (Doc. 38, PageID 519).

## IV. <u>Conclusion</u>

Based on the foregoing, it is hereby **ORDERED** that Defendants' Motion to Dismiss and for Sanctions (Doc. 34) is **GRANTED in part** and this matter is dismissed without prejudice. Consequently, Plaintiff's Motion for a Preliminary Injunction (Doc. 4) is **DENIED as moot**. This matter is **CLOSED** and **TERMINATED** from the active docket of this Court.

**IT IS SO ORDERED**.   _s/ Michael R. Barrett_____
Michael R. Barrett, Judge
United States District Court

---

[2] The Court emphasizes Defendant's statement that they "have been careful to identify that the issues which are the subject of [their] Motion are not raised because of Plaintiff's counsel's conduct; it is Plaintiff who has refused to properly participate in discovery by providing the requested information. This is the reason that the Defendants have sought dismissal of the claims, not because of any action by Plaintiff's counsel" (Doc. 41, PageID 581, n.1).

12